

Stephen B. Selbst
Partner
Phone: 212.592.1405
Fax: 212.545.2313
sselbst@herrick.com

September 29, 2016

<u>VIA FEDERAL EXPRESS</u>

Honorable Robert D. Drain
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
Federal Building and Courthouse
300 Quarropas Street
White Plains, NY 10601

Re:    <u>In re 97-111 Hale, LLC, Case No. 15-22381 (RDD) (Jointly Administered)</u>

Dear Judge Drain:

This firm represents Grand Pacific Finance Corp. ("Grand Pacific") in the above-referenced chapter 11 cases. We also represented Grand Pacific in the trial of the foreclosure action and counterclaims that the Court remanded to Supreme Court, Westchester County (the "Westchester Action") in its order dated July 20, 2015 (the "Remand Order") [ECF #14].

Testimony in the Westchester Action concluded in December 2015 and the matter was fully submitted in May 2016. On September 16, 2016, Justice Walker issued a decision in the Westchester Action, a copy of which is enclosed herewith, finding that Grand Pacific was entitled to a judgment of foreclosure and dismissing the counterclaims and affirmative defenses interposed by the defendants in that matter, which defendants include the above-captioned debtors herein.

We write to obtain confirmation that the Remand Order does not bar entry of judgment in the Westchester Action. In seeking such confirmation, Grand Pacific acknowledges that the automatic stay remains in effect as to the above-captioned debtors' real property. Grand Pacific intends to seek relief from the automatic stay with respect to such real property from this Court once the foreclosure judgment has been entered.

Respectfully submitted

Stephen B. Selbst

SBS/jr
Enclosures
cc:    Jonathan Pasternak



Honorable Robert D. Drain
Page 2
September 29, 2016


bcc:    Scott Tross
        Hanh Huynh

To commence the statutory
time for appeals as of right
(CPLR 5513[a]), you are
advised to serve a copy
of this order, with notice
of entry, upon all parties.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
PRESENT: HON. SAM D. WALKER, J.S.C.

---------------------------------------------------------------------x

GRAND PACIFIC FINANCE CORP.,

Plaintiff,

DECISION AND ORDER
Index No. 8084/2009

-against-

97-111 HALE, LLC, 100-114 HALE, LLC, JOE BOBKER,
THE CITY OF WHITE PLAINS, THE COUNTY OF
WESTCHESTER, PEOPLE OF THE STATE OF NEW
YORK and "JOHN DOE" NOS. 1-25,

Defendants.

---------------------------------------------------------------------x

97-111 HALE, LLC, 100-114 HALE, LLC, ELI BOBKER,
BEN BOBKER and JOE BOBKER,

Counterclaim-Plaintiffs/
Crossclaim-Plaintiff

-against-

GRAND PACIFIC FINANCIAL CORP.,

Counterclaim-Defendant,

and

FINANCIAL ONE GROUP, GLOBAL ONE CORP.,
GLOBAL HOLDING CORP., GRAND PACIFIC
HOLDINGS N.V., 366 MADISON, INC., UNITED ASIAN
FUNDS, LLC, ROBERT W. HEINEMANN, KENNY
HUANG, JEFFREY KOO, JR., ANDRE J.L. KOO
MICHAEL CHIH CHANG LIN a/k/a C.C LIN a/k/a

MICHAEL LIN, THEODORE JER-JYH CHEN a/k/a TED
CHEN, CHANG-MING HUANG, a/k/a JOHN HUANG,
a/k/a JAMRS HUANG, BELTON YU CHUNG LEE a/k/a
BELTON LEE, FIFTH FIELD LLC and LOUISE
VARSOS,

                                    Counterclaim-Defendants
-------------------------------------------------------------------------------x

     This matter was assigned to this non-commercial part to conduct a trial on the

remaining outstanding issues in this protracted commercial matter. The trial

commenced on December 9, 2015 with closing arguments on May 16, 2016. The Court

will begin by laying out the facts as presented by the parties at trial.

     This is an action to foreclose a mortgage in the original principal amount of

$5,362,500.00 encumbering vacant land known as and by the street addresses of 97-

99 Hale Avenue, 100 Hale Avenue, 101-103 Hale Avenue, 102 Hale Avenue, 104-106

Hale Avenue, 105-107 Hale Avenue, 109-111 Have Avenue, 110 Hale Avenue and

112-114 Hale Avenue, White Plains, New York ("Mortgaged Property"). Defendants,

97-111 Hale, LLC ("97-111 Hale"), 100-114 Hale, LLC ("100-114 Hale") and Joe

Bobker ("Defendants") defaulted on the underlying note, mortgage and guaranty by

failing to pay the loan when it matured on August 16, 2007. On May 20, 2011, Grand

Pacific obtained a judgment in New York County for $13,710,124 on the three other

loans relating to the mortgaged property. Grand Pacific now seeks judgment on the

fourth and final loan.

     Based upon the prior decisions of the trial courts and/or the Appellate Division,

First and Second Department, and upon agreement of the parties, there are only two

issues remaining to be determined by this Court. The first issue is whether Grand

Pacific acted in bad faith or engaged in oppressive and unconscionable conduct such

2

that it should be prevented from foreclosing its mortgage and the second issue is whether Defendants and ("Counterclaim-Plaintiff/Crossclaim Plaintiff") are entitled to declaratory relief.

Defendants, 97-111 Hale, 100-114 Hale and River Rd. Condo, LLC are real estate developers who in 2004 purchased the mortgaged property from Alexander's Inc. for $4,500,000. The purchase price was financed by a first mortgage loan from Chinatrust Bank (U.S.A.) in the amount of $2,375,000 and a second mortgage from Grand Pacific in the amount of $1,650,000. In 2005, Defendants obtained $5,500,000 in financing from Sterling Real Estate Holding Company, Inc.("Sterling"), which was used to retire the loans from Chinatrust Bank and Grand Pacific. The Sterling Loan was secured by a mortgage and a guaranty of payment given by Eli Bobker and Ben Bobker.

At or about the time of the purchase by 97-111 Hale, 100-114 Hale and River Rd. Condo, the purchasers entered into discussions with Alexander Gurevich ('Gurevich") to sell the property to him. According to Gurevich, the parties were unable to enter into a contract because the buildable square footage kept changing and the sellers wanted a time of the essence closing. Ben Bobker testified that Gurevich offered $100/sq.ft. which was approximately $18,500.000. Gurevich disputes this offer. Ben Bobker testified that he mentioned the offer to Michael Lin ("Lin"), Grand Pacific's President, and Belton Lee ("Lee") also from Grand Pacific, who agreed to match the offer and provide financing for the construction project. Gurevich denied offering $18,500,000, stating that the most he recalled offering was $16,500,000.

3

The Bobkers selected to go with Grand Pacific because they thought that Grand Pacific's offer was a better deal for them. They began having discussions with Grand Pacific, seeking financing in the amount $10,000.000. Grand Pacific could only come up with $7,000,000 which was in the form of a mortgage loan in the amount of $5,362,500 and a mezzanine loan in the amount of $1,637,500. Both loans closed on August 16, 2006. The mortgage loan was evidenced by a promissory note made by 97-111 Hale and 100-114 Hale and secured by a second mortgage on the mortgaged property and a guaranty given by Joe Bobker. The mezzanine loan was evidenced by a term note made by Hale Club, LLC ("Hale Club") and secured by a pledge of Joseph Klaynberg's membership interest in the Hale Club and a guaranty given by Joe Bobker.

To make up the shortfall, the Bobkers' decided to borrow the additional $3,000,000 from two investors provided by Michael Lin. The first investor was, 366 Madison, Inc. ("366 Madison"), which was owned and/or controlled by Jeffrey Koo, Sr., a substantial shareholder in Grand Pacific's parent company, and the second investor was Global One Corp., ("Global One"), which was owned and/or controlled by Andre Koo who was also a substantial shareholder in Grand Pacific's parent company. 366 Madison Loan was evidenced by a term note in the amount of $1,000,000.00 and Global One's loan was evidenced by a term note in the amount of $2,000,000.00. Both loans bear interest rates of 10% per annum and are secured by a 20% membership interest in 97-111 Hale and 100-114 Hale. Joe Bobker testified that during the negotiations with Lin and Lee he was never told who the investors were and that they just negotiated the terms of the loan. It is Plaintiff's contention that although Defendants characterized the $3,000,000 loan as an "investment" in the debt, Joe

4

Bobker himself wanted the transaction structured as a loan "because of tax reasons." However, Chang requested that the $3,000,000 be a debt instrument, non-recourse and no security, other than the 20% interest in the Hale LLC.

According to Plaintiff, Lin intentionally hid the involvement of 366 Madison and Global One from Grand Pacific's credit committee, by creating a "firewall" between 366 Madison/Global One and Grand Pacific so that Grand Pacific credit committee could not be influenced by the Koos' involvement. In order to preserve the "firewall" the security interest of the lenders was held by United Asian Funds, LLC ("United Asian Fund") as nominee. Plaintiff admitted that Lin's action was a violation of Grand Pacific's loan procedures. As a result of Lin's action the loans were successfully hidden from Grand Pacific's management until the latter part of 2007 and by that time, Grand Pacific's mortgage and mezzanine loans were in default.

Defendants initially attempted to obtain finance from Chinatrust which proved unsuccessful. They then went to Gurevich for assistance. Gurevich efforts resulted in the issuance of a term sheet by Lehman Brothers ("Lehman"), which provided for an advance of $9,400.000.00. However, the three outstanding loans to Sterling and Grand Pacific amounted to $13,500,000.00 and that did not include the $3,000,000.00 owed to 366 Madison and Global One. As Gurevich stated in his deposition, you cannot use $9,400,000.00 to pay off $13,500,000.00. To pay off all outstanding debts, Lehman would have to provide $16,500.00.00.  Lehman's term sheet definitely did not provide sufficient funds to satisfy the acquisition costs.

Plaintiff contends that the Bobkers' claim that the Lehman financing did not close because of Lee's insisting upon the repayment of the $3,000,000.00 to 366

Madison and Global One, is without merit. From reading Gurevich's deposition, there were many reasons why this loan did not close. First, there was a short fall in the acquisition cost and Bobkers was trying to make up the shortfall by trying to structure a deal with Lee regarding the $3,000,000.00 debt. That proved unsuccessful.  Also, Gurevich testified at his deposition that, to make up the shortfall, he was willing to reinvest his fees back into the project so that Lee could be paid. In fact, Gurevich concluded in his deposition that the short fall did not represent an obstacle that could not be overcome to continuing to work on the deal.

At the same time, there was an absence of clarity on the square footage that could be built on the property. Gurevich testified that Lehman would never close the loan and release any funds until they had approved plans in place. Also, the Lehman's term sheet required that all approvals and permits to construct the project in accordance with the approved plans and specifications be obtained and approved by the Lender. There were none in place at that time for the closing to occur.

Furthermore, Lehman's term sheet prohibited subordinate financing    and required that no direct or indirect interest in borrower may be pledged or encumbered as collateral for any financing. Therefore, based upon Lehman's term sheet, the 366 Madison and Global One loan had to be satisfied at the closing.

The 366 Madison and Global One loans were not repaid upon maturity on August 16, 2007 and are now in default. As of December 4, 2015, there was a total due and owing of $10,473,011.49 and interest is continuing to accrue at a rate of $1,452.34 per day. Joe Bobker conceded that the $3,000,000 in principal due under the notes has not been repaid.

6

In July 2007 Grand Pacific and the Bobkers engaged in workout discussions with respect to all the loans including the 366 Madison and Global One loans. Several proposals were made but the parties were unable to come to an agreement. Joe Bobker testified that at one point he offered to pay off the Grand Pacific mortgage and mezzanine loan, however, it made no sense that Plaintiff would have refused to accept the payoff of these loans. In fact, the testimony suggests that in September 2007, the Bobkers offered to pay $7 million in full satisfaction of the $10 million loaned by Grand Pacific, 366 Madison and Global One. Later the same week, they offered $4.5 million toward the two Global Pacific loans, with the 366 Madison and Global One loans remaining in place.

By September 2007, Sterling's $5.5 million loan and a second loan made by Sterling to 97-111 Hale and 100-114 Hale in the amount of $1 million were in default. Grand Pacific was then forced to protect its interest since it was in third position. Sterling and Grand Pacific had discussions and Sterling agreed to hold off on commencing foreclosure proceedings until January 2008. However, Grand Pacific had to make the interest payments that were due from October 2007 to January 2008.

On January 15, 2008, Sterling and Grand Pacific entered into a letter agreement for Grand Pacific to purchase participation in both Sterling mortgages utilizing an installment method based upon Grand Pacific's liquidity. Grand Pacific also wanted Sterling to agree that it could sue the Bobkers on the guaranty before making full payment which Sterling initially resisted, but ultimately agreed. Grand Pacific purchased the $1 Million loan on January 15, 2008 and the $5.5 million loan as follows: 9.0909% on January 15, 2008; 18.1818% on February 29, 2008, March 31, 2008, April

7

30, 2008 and May 30, 2008; and the balance on June 30, 2008. Even though the Sterling notes were in default, Grand Pacific paid full price (dollar for dollar) for the notes. The Bobkers contend that Grand Pacific purchased the Sterling notes/participation agreement with 366 Madison's money which is a violation of Section 3.3. of the Operating Agreement. However, Grand Pacific argues that the Bobkers have not demonstrated that the $3,490,000.00 received from 366 Madison on December 31, 2007 was used to purchase the Sterling notes. In October 2010, Grand Pacific repurchased the Sterling mortgage participation agreement from 366 Madison.

In January 2008, the Bobkers made a second attempt through Gurevich to obtain construction financing from Lehman. This also failed. Grand Pacific was willing to settle for a cash payment at closing of $3 million with the balance of Grand Pacific/366 Madison/Global One loans converted to equity in the project. Lehman's broker suggested Grand Pacific settle for cash at closing of $1 million with the remainder being reinvested at closing. Grand Pacific then proceeded to issue notices of default, dated February 21, 2008 on its mortgage and mezzanine loans.

Plaintiff commenced this action in April 2009 by filing a Verified Summons and Complaint. In July 2009, Defendants served a Verified Answer in which they admitted execution and delivery of the note and mortgage, and default in payment. In August 2009, Defendants served a Verified Amended Answer. The Verified Amended Answer contained thirteen affirmative defenses, seven counterclaims, and eight cross-claims. Simultaneously with the Westchester action, Plaintiff filed an action in New York

8

County to recover the amount due under the Sterling Loans and the Grand Pacific's mezzanine loan. The Court will reference the decisions rendered in the New York County action, Westchester County action, as well as the Appellate Division, First and Second Department to the extent that they are relevant in deciding the issues before the Court.

Grand Pacific was granted summary judgment in the New York County action, and a judgment was entered in New York County against Defendants in the amount of $13,710,124.14. This judgment was affirmed by the Appellate Division, First Department. Plaintiff also move for summary judgment in the instant action (Westchester County Action) which was denied, with the court (Smith, J.) finding that even though Grand Pacific made out a prima facie case, Defendants "in the pre-discovery status" successfully raised issues of fact with respect to their default. Defendants were then given permission to serve a second Amended Verified Answer. Defendant/Counterclaim-Plaintiff asserted twelve affirmative defenses and five counterclaim/crossclaims and added six new crossclaim-defendants, Global Holding Corp., Jeffrey Koo, Jr., Theodore Chen, Belton Lee, Fifth Field, LLC and Louise Versos.

Following the entry of a Trial Readiness Order, Plaintiff moved again for summary judgment. Justice Smith reaffirmed her prior ruling that Grand Pacific made out a prima facie case for foreclosure, struck several of the Defendants' affirmative defenses, and dismissed several counterclaims and crossclaims asserted against

9

Plaintiff/Crossclaim-Defendants. Justice Smith, however, declined to strike Defendants' fourth, seventh, eighth and ninth affirmative defenses, or to dismiss the counterclaim/crossclaims for fraud, breach of fiduciary duty and declaratory judgment insofar as it sought equitable relief.

Plaintiff appealed and the Appellate Division, Second Department affirmed Plaintiff's meeting its burden of establishing a prima facie case for foreclosure, as well as striking several affirmative defenses, and dismissing Counterclaim-Plaintiffs' counterclaim for fraud and breach of fiduciary duty. The Appellate Division, however, denied summary judgment on Plaintiff's foreclosure claim, holding that Defendants/Counterclaim-Plaintiffs "raised a triable issue of fact as to whether Grand Pacific acted in bad faith and engaged in oppressive and unconscionable conduct in, among other things, allegedly preventing the Bobker respondents from paying off the loan secured by the subject mortgage unless they also paid off certain loans made by" Global One and 366 Madison, and whether Plaintiff interfered "with the Bobker respondents' attempts to obtain funds from, or sell subject properties to, other investors." *Grand Pacific Finance Corp. v. 97-111 Hale, LLC*, 123 A.D.3d 764, 1 N.Y.S.3d 115 (2d Dept. 2014).

As a result of the New York County Judgment an Installment Payment Order was issued which required Joe Bobker to pay $6,167 per month, Eli Bobker to pay $13,833 per month and Ben Bobker to pay $13,833 per month. The Bobkers have not made a single payment. In March 2015, 97-111 Hale and 100-114 Hale filed for

10

Chapter 11 bankruptcy. Defendants then filed a third Amended Verified Answer which was nearly identical to the second Amended Verified Answer filed in this action. The bankruptcy court remanded the claims filed in the third Amended Verified Answer to this Court for disposition.

Did Grand Pacific Act in Bad Faith or Engage in Oppressive and Unconscionable Conduct

Defendants claim that Grand Pacific sabotaged the efforts of the Hale LLCs' to obtain financing that would have taken Grand Pacific out, in that, as a condition to allowing the financing to occur and to release their mortgage, Grand Pacific wanted $3 million paid to the equity investor entities that it turns out were affiliates of Grand Pacific. As part of the sabotage, Joe Bobker testified that he needed 366 Madison and Global One's consent to complete the Lehman financing and they refused. Plaintiff argues that no such consent was required under Section 4.6 of the 97-111 Hale and 100-114 Hale Operation Agreement which provides that "Major Decisions" such a refinancing, only required the written consent of the managing members (Hale Club) and 80% of the members interest. Here, 366 Madison and Global collectively owned 10% of 97-111 Hale and 100-114 Hale. Therefore, under the Operating Agreement, the Bobkers did not need 366 Madison and Global One's consent to consummate the Lehman deal and could have proceeded with the Lehman financing and address the Grand Pacific issue at a later time.

11

Since 366 Madison and Global One's ownership interest in 97-111 Hale and 100-114 Hale was below the percentage required to impact the Lehman financing, it was up to the Bobkers to decide how they wanted to proceed. Surely, Plaintiff could have demanded payment, but under the terms of the agreement Plaintiff had no leverage. The Bobkers could have gone ahead and made the deal with Lehman provided that they could satisfy the other conditions of the financing. Instead, the Bobkers, based upon the record, were seeking a discount from Grand Pacific. They offered $7 million to satisfy the $10 million debt which included the 366 Madison and Global One loans. Later that same week, the Bobkers put forth Kleinberg suggested settlement offer which changed the offer to $4.5 million keeping the equity loan for $3 million active. According to Grand Pacific, this was a worse offer, and to settle the matter Grand Pacific demanded $8.5 million in full satisfaction of the $10 million debt.

It seems from the record that the Bobkers were trying to negotiate a reduction from Grand Pacific in order to make the deal with Lehman work. If the $3 million loan from 366 Madison and Global One created a problem, all the Bobkers had to do was to tender the $7 million owed to Grand Pacific and worry about the $3 million later. Instead they lowered the offer to $4.5 million with the $3 million being carried as equity. It is clear from the records that there was a shortage of cash to make the Lehman deal work and the Bobkers were unwilling or unable to come up the additional funds. The $3 million seems to be a smoke screen for the deal not moving forward. There was clearly a shortage of cash on the part of the Bobkers to make the deal work.

12

Lastly, the Lehman term sheet dated January 5, 2007 prohibited subordinate financing and states that "no direct or indirect interest in borrower may be pledged or encumbered as collateral for any financing." Therefore, the Bobkers had to pay-off the 366 Madison and Global One loans before the deal with Lehman could close. Furthermore, according to Gurevich there were other issues with the project such as lack of clarity as to the square footage that could be built on the property. According to Defendant's Exhibit 48, which predated Plaintiff's repurchase of the Sterling Loan, the borrower (Bobkers) was thinking about dropping the project because of the market slowdown, and that the projected $625/per sq. ft selling price may not have been achievable. Also, the construction price, both in terms of labor and materials, had gone up significantly. In fact, there were a variety of reasons why it may not have been prudent to move forward with the Lehman loan at that time.

The Bobkers then argue that the loans made by 366 Madison and Global One were non-recourse loans and did not have to be repaid. It is undisputed that these loans were non-recourse loans which largely exempts the borrower and guarantors from personal liability for the remaining debt in the event of a default, and leaves the lender with the sole recourse of repossession of the property which served as security under the loan agreement, *G3-Purves Street LLC v. Thomas Purves, LLC* 101 A.D.3d 37, 953 N.Y.S.2d 109, 2012 N.Y. Slip Op. 06919 (2d Dept. 2012). Here, however, the term sheet from Lehman required all subordinate loans be satisfied and, therefore, the deal could not proceed to closing unless plans were made to satisfy both Grand

.13

Pacific's $7 million debt and 366 Madison and Global One's $3 million mortgages. The Bobkers could not come up with the liquid cash to meet Lehman's loan requirement and consequently they entered into negotiations with Grand Pacific to reduce their dept.  Therefore, the loans being non-recourse did not make a difference since it had to be paid off as a condition of the Lehman loan. Moreover, Grand Pacific was the entity that procured the 366 Madison and Global One loans for the Bobkers and should not be precluded from collection of the same. Furthermore, regarding Defendants being kept in the dark about the relationship between Grand Pacific, 366 Madison and Global One, the Appellate Division, Second Department has already ruled that Grand Pacific did not fail to disclose its relationship with Global One and 366 Madison to Defendants.

Defendants' next contention is that Grand Pacific's purchase of the Sterling Loans was improper. This is clearly not the case. The Sterling loans were secured by a first and second mortgage on the property. Grand Pacific was in third position. Defendants had defaulted on the Sterling loans and Sterling was threatening foreclosure.  Any foreclosure would have wiped out Grand Pacific loans. To prevent this from happening, Grand Pacific purchased the Sterling loans. This purchase was foreseeable because Grand Pacific had to protect its interest. Furthermore, Defendants knew that Grand Pacific was contemplating purchasing the two Sterling loans. In communications between Grand Pacific and the Bobkers as far back as September

14

2007, Belton Lee advised the Bobkers that Grand Pacific may choose to purchase the Sterling loans. Therefore, this could not have been a surprise to the Bobkers.

Defendants' next contention is that Grand Pacific was precluded from purchasing the Sterling Loans with money provided by 366 Madison in violation of the 97-111 Hale and 100-114 Hale operating agreement. These payments took the form of 366 Madison purchasing participation in several of Grand Pacific loans such as its mortgage and mezzanine loans. Defendants attempt to show a paper trail of funds from 366 Madison to Grand Pacific. However, it is unclear from the record whether the funds transferred from 366 Madison to Grand Pacific were the funds actually used to purchase the Sterling loans. On December 31, 2007, $10 million was transferred from 366 Madison to Grand Pacific Finance Corp. ($3,490,000) and Grand Pacific Financing Corp. ($6,510,000). Payments made to Sterling were made in increments spanning the period January 2008 to June 2008, which Grand Pacific' alleges was due to liquidity. Therefore, it is unclear from the record which funds were actually used to purchase the Sterling loans. Furthermore, at the same time, Grand Pacific was involved with other participation agreements involving other non-related entities.

With respect to the Grand Pacific loans violating Section 3.3 of the 977-111, Hale and 100-114 Hale's Operating Agreement by selling participations in its mortgage and mezzanine loans, Justice Jaffe ruled that Grand Pacific and 366 Madison did not sign the Hale LLC Agreement and, therefore, cannot be held liable for breaching it, *Adams v. Boston Properties, Ltd. Partnership*, 41 A.D.3d 112 (1st Dept. 2007).

15

Furthermore, Grand Pacific repurchased the participations on October 8, 2010, nullifying 366 Madison's interest in the two loans and rendering Defendants' contention moot.

Defendants also allege that Grand Pacific interfered with their relationship with Gurevich, in that, Gurevich offered in May 2006 to purchase the Hale project for approximately $18.5 million and Grand Pacific asked that the Hale LLC not proceed with the Gurevich offer in favor of their deal with the Hale LLC on the project.However, Gurevich denied ever offering Defendants $18.5 million to purchase the Hale project. Gurevich testified in his deposition that he discussed numerous financial options with the Bobkers, but never made such an offer. In fact, Gurevich testified that he made an offer to purchase the land for $6.7 million cash and that he would seek financing for the construction. However, there was a problem with the actual square footage that could be built on the land. The matter dragged on and on without clarification on the square footage and the deal ended up not closing. And even if there was an agreement with Gurevich for $18.5 million, which he denies, the loss of an alternative contractual bargain cannot serve as a basis for fraud or misrepresentation damages because the loss of the bargain was "undeterminable and speculative", *Luma Holding Company v. Smith Barney, Inc.,* 88 N.Y.2d 413, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996).

It is clear from the records that there were many reasons why the Lehman loan did not close. Gurevich's deposition sets it out very clearly. First, there was a short fall in the acquisition cost and the Bobkers were trying to make up the shortfall by trying to

16 .

structure a deal with Lee regarding the $3,000,000 debt. This proved unsuccessful. Gurevich further testified at his deposition that, to make up the shortfall, he was willing to reinvest his fees back into the project so that Lee could be paid. In fact, Gurevich concluded in his deposition that the short fall did not represent an obstacle that could not be overcome by continuing to work on the deal.

At the same time, there was an absence of clarity on the square footage that could be built on the property. Gurevich testified that Lehman would never close the loan and release any funds until they had approved plans in place. Also, the Lehman's term sheet requires that all approvals and permits to construct the project in accordance with the approved plans and specifications be obtained and approved by the lender. There was none in place at that time for the closing to occur. Furthermore, Lehman's term sheet prohibited subordinate financing and required that no direct or indirect interest in borrower may be pledged or encumbered as collateral for any financing. Therefore, other than trying to negotiate a reduction to make up the financial shortfall to make the Lehman deal occur, the 366 Madison and Global One Loan had nothing to do with the Lehman deal falling apart. The Bobkers are simply trying to get out of their obligation to repay Grand Pacific. The Bobkers failed to establish that Grand Pacific acted in bad faith or engaged in oppressive and unconscionable conduct.

17

Defendants' Claim for Declaratory Judgment

Defendant seeks a declaratory judgment in their fifth counterclaim, alleging that:

> (a) the Hale LLC's have no liability to Grand Pacific in connection with financing or equity investments in the Hale Project; (b) all liens held by Grand Pacific with respect to the Hale Project are of no further force or effect; (c) all guaranties with respect to the Hale Project are of no force or effect; (d) all funds that Grand Pacific utilized to acquire the Sterling notes constitute capital contributions with respect to the Hale Project and not loans and (e) Grand Pacific are [sic] liable to the Bobker Group in an amount to be determined at trial.

Defendants did correctly acknowledge in their third Amended Verified Answer that their first, second, third, and fourth counterclaims have been dismissed. However, they failed to acknowledge that the trial court also dismissed that portion of their fifth counterclaim which sought monetary damages. Justice Smith opined in her Decision of March 28, 2013, that "[t]his Court is not aware of any authority holding that compensatory damages may be properly sought in a declaratory judgment claim." Therefore, this issue has been previously litigated and, Defendants attempt to again seek compensatory damages must fail.

Defendants are also claiming declaratory relief relating to the two Sterling Loans and Grand Pacific's mezzanine loan. This too must fail. These loans were considered and adjudicated as valid and enforceable in the New York County action, and based upon the doctrines of res judicata and/or collateral estoppel they cannot be re-litigated in this action. The doctrine of collateral estoppel, a narrower species of res judicata, precludes a party from re-litigating in a subsequent action or proceeding, an issue

clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same, *Ripley v. Storer*, 309 N.Y. 506, 517, 132 N.E.2d 87; see, also, *Restatement, Judgments* 2d, § 27; *46 Am.Jur.2d, Judgments*, § 415; *9 Carmody-Wait 2d, N.Y.Prac.*, Judgments, § 63:205. To invoke the doctrine of collateral estoppel, Grand Pacific must satisfy two elements: (1) the identical issue was decided in the prior action and is decisive in the present action, and (2) the party to be precluded from re-litigating the issue had a full and fair opportunity to contest the prior issue", *Luscher v. Arrua*, 21 A.D.3d at 1007, 801 N.Y.S.2d 379.

Here, it is uncontroverted that in the New York action, Grand Pacific obtained summary judgment enforcing the terms of the two Sterling loans and the Grand Pacific mezzanine loan and this determination was affirmed by the Appellate Division, First Department. Implicit in that decision was a determination by the Court of the validity of the loan documents and liens associated therewith. These same loan documents were challenged by the Bobkers as part of the New York County action and again they seek to place the same documents before this Court. The Bobkers are collaterally estopped and barred from seeking the same relief sought in their fifth counterclaim regarding the loan documents.

The Bobkers' also claim that they are entitled to declaratory relief with respect to the $5,362,500 loan. This was part of the $7 million loan which was extended to the Bobkers on August 16, 2006 in the form of a mortgage loan in the amount of

19

$5,362,500 and a mezzanine loan in the amount of $1,637,500. The Bobkers claim in their tenth affirmative defense that "Plaintiff's claims against Joe Bobker are barred because Grand Pacific fraudulently created a false social security number for Joe Bobker in connection with the note and mortgage..." Also in their eleventh affirmative defense, Defendants alleged that, "[a]ll of Plaintiff's claims as against Joe Bobker are barred because Joe Bobker's guaranty with respect to the note and mortgage was never intended to be, and never became effective." Finally, as and part of their fourth counterclaim and crossclaim, the Bobkers allege that "based upon the misconduct of Grand Pacific and Lee, Joe Bobker is entitled to a judgment determining that the guaranty form which he supplied to Grand Pacific and Lee is of no force and effect."

However, Justice Smith in her Decision and Order dated March 28, 2013, rejected Defendants' fourth counterclaim and crossclaim, granting Plaintiff's motion for summary judgment "to the limited extent that it is entitled to judgment against Bobker based upon his breach of the August 16, 2006, guaranty." Justice Smith also granted Plaintiff's, motion to strike Defendants tenth (fraud relating to social security number of Joe Bobker) and eleventh affirmative defense (claim against Joe Bobker waived). Because this issue has already been addressed by Judge Smith, the Bobkers' claim for declaratory relief based upon guaranty, is rendered moot and must be denied. The $5,362,500 note and mortgage are therefore valid and enforceable.

Grand Pacific further argues that the Bobkers should be barred from recovery on their counterclaims based upon the doctrine of unclean hands. The doctrine of

20

unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct" *Kopsidas v. Krokos*, 294 A.D.2d at 407, 742 N.Y.S.2d 342 (2d Dept. 2002).

To support this position, Plaintiff referenced comments by the judge in the New York County action that Joe Bobker was "a sophisticated business man who doesn't bristle at committing perjury"; the fact that Joe, Eli and Ben Bobker have not made any of the payments to Grand Pacific that was ordered by the New York County court; the fact that the Bobkers conceded that they were making payment to Grand Pacific's employees for obtaining funding from Grand Pacific and others; that most of the $16.5 million loaned to 97-111 Hale, 100-114 Hale and Hale Club appears to have been disbursed for the Bobkers' personal benefit; and as a result of the aforementioned disbursements, 97-111 Hale and 100-114 Hale lacks resources to repay the loans or to pay property related expenses such as real estate taxes.

The only conduct of the Bobkers which would be of concern to the Court in invoking the doctrine of unclean hands, concerns the portions of loans made to 97-111 Hale and 100-114 Hale in the amount of $16.5 million and disbursed for the Bobkers' personal benefit. Though the Court does not find that these claims rise to the level of unclean hands, it does however, raise serious questions about the viability of the Bobkers' claim that the Lehman deal fell apart because of Grand Pacific's refusal to

21

drop its demand for the repayment of the $3 million. Having encumbered the property to the tune of $16.5 million for its personal benefit while at the same time blaming the demise of the Lehman deal on Grand Pacific defies' common sense. The Bobkers squeezed every penny out of the property for their personal use and were unable to come up with the liquid funds to satisfy the condition of the Lehman loan. They are now trying to pass the blame onto Plaintiff, Grand Pacific. This seems to be an argument concocted by the Bobkers to divert the Court's attention from the true reason why the construction did not move forward and confirms the New York County Judge's comment on Joe Bobker's veracity.

The Bobkers' next contention is that the participation purchased by 366 Madison in Grand Pacific's mortgage constitutes "a partial pay off or satisfaction of part of the Grand Pacific debt." The Bobkers raised the same issue in a related action and Justice Jaffe granted summary judgment dismissing all of Bobker's claims, stating that "the participation agreement between Grand Pacific and 366 Madison neither transfer nor assign title to the loan. 366 Madison only participated into the loan, and the parties agree that Grand Pacific retains possession of all of the original loan documents and servicing right." She concluded that, Grand Pacific retained exclusive right to enforce Bobkers obligation and "plaintiff offered no authority for the proposition that 366 Madison's $1,637,400 interest constitutes payment of the underlying note." Furthermore, Grand Pacific repurchased 366 Madison's participations on October 8, 2010, negating all payments.

22

The Bobkers also seek monetary damages in their sixth counterclaim based upon wrong doing set forth in their fifth counterclaim. The Supreme Court, both in Westchester and New York County and both the Appellate Division, First and Second Departments have addressed and dismissed the Bobker's counterclaim for fraud, breach of fiduciary duty, conversion, fraudulent inducement and that portion of the Bobkers' fifth counterclaim that sought monetary damages. The Bobkers are bound by those decisions under the doctrine of law of the case and will not be allowed to reinstate them in these proceedings. The Court has thus addressed the issues identified by this Court and confirmed by the parties

It is the finding of this Court that the Defendants/Counterclaim-Plaintiff failed to establish that Grand Pacific acted in bad faith or engaged in oppressive and unconscionable conduct such that it should be prevented from foreclosing its mortgage; and that Defendants and ("Counterclaim-Plaintiff/Crossclaim-Plaintiff") are entitled to declaratory relief. Plaintiff holds (Grand Pacific, 366 Madison and Global One) mortgages totaling $16.5 million based upon loans made to 97-111 Hale and 100-114 Hale, most of which proceeds were diverted to personal use and not to the construction project. Defendant/Crossclaim-Plaintiff defaulted and have not repaid any of these loans.

Plaintiff has established a prima facie case for a judgment of foreclosure and sale. "To establish a prima facie case in an action to foreclose a mortgage, the plaintiff must establish the existence of the mortgage and mortgage note, ownership of the

23

mortgage, and the defendant's default in payment," *Campaign v. Barba*, 23 AD3d 327 (2d Dept. 2005). Where the proponent of the motion makes a prima facie showing of entitlement to summary judgment, the burden shifts to the party opposing the motion to demonstrate by admissible evidence the existence of a factual issue requiring a trial of the action, *Vermette v. Kenworth Truck Co.*, 68 N.Y.2d 714, 717 (1986). Grand Pacific has established the existence of the mortgage and mortgage note, ownership of the mortgage and note, and Defendants admitted to being in default in satisfying the mortgages which has remained past due for several years.

The burden now shifts to Defendants/Counterclaim-Plaintiff to raise a triable issue of fact, *Wilmington Trust Co. v. Ajudua*, 287 A.D.2d 451, 730 N.Y.S.2d 871; *Kowalski Enters. v. Sem Intl.*, 250 A.D.2d 648, 672 N.Y.S.2d 427. The Defendants/Counterclaim-Plaintiff has failed to raise triable issues of fact or any viable defenses in support their failure to satisfy the mortgages. Instead, they have put forth a smokescreen to divert the Court's attention from focusing on the intricacies of the transaction, the state of the construction industry and the economic crisis in the real estate industry at the time the Lehman loan was being contemplated. Plaintiff has established its entitlement to a judgment of foreclosure and sale.

The foregoing constitutes the Opinion, Decision and Order of the Court.

Dated: White Plains, New York
September 16, 2016

HON. SAM D. WALKER, J.S.C.

24